# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00718-SCT

### IN THE MATTER OF C.W.: THE MISSISSIPPI DEPARTMENT OF MENTAL HEALTH AND STATE OF MISSISSIPPI

*v.*

### LAMAR COUNTY, MISSISSIPPI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2017 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARY JO WOODS |
| |     DOUGLAS T. MIRACLE |
| |     WILLIAM MELVIN ROSAMOND |
| | CYNTHIA TOMLINSON EUBANK |
| ATTORNEY FOR APPELLEE: | KATHY DENISE SONES |
| NATURE OF THE CASE: | CIVIL - UNCONSTITUTIONAL STATUTE |
| DISPOSITION: | REVERSED AND REMANDED - 08/16/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2017-CA-00721-SCT

### IN THE MATTER OF R.M.: MISSISSIPPI DEPARTMENT OF MENTAL HEALTH AND STATE OF MISSISSIPPI

*v.*

### LAMAR COUNTY, MISSISSIPPI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2017 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |

COURT FROM WHICH APPEALED: LAMAR COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS: OFFICE OF THE ATTORNEY GENERAL
BY: MARY JO WOODS
DOUGLAS T. MIRACLE
WILLIAM MELVIN ROSAMOND
CYNTHIA TOMLINSON EUBANK
ATTORNEY FOR APPELLEE: KATHY DENISE SONES
NATURE OF THE CASE: CIVIL - UNCONSTITUTIONAL STATUTE
DISPOSITION: REVERSED AND REMANDED - 08/16/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WALLER, C.J., MAXWELL AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. This case requires this Court to determine if Mississippi Code Section 41-21-77 allows a director of a state hospital independently to override a commitment order of a chancery court for treatment of mental illness. It does not. And because this statutory question comes to this Court through the vehicle of a citation of contempt, this case also requires this Court to review the citation of contempt to determine whether the chancery court's classification of the contempt was correct and whether correct procedures were followed in the finding of contempt. As fully explained below, we find that the chancery court erred in its contempt determination. We reverse the chancery court's contempt finding, we remand the case for an entry of an order of recusal, and we otherwise order proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

2

¶2.     In 2017, two individuals—R.M.[1] and C.W.[2]—were committed to the South Mississippi State Hospital (SMSH) to be treated for mental illness.  As required under the commitment statute, both R.M. and C.W. were evaluated by court-appointed physicians, one a medical doctor, the other a psychologist.  In the cases of both individuals, the evaluating physicians were the same two physicians.  And in both cases, the physicians' recommendations were the same: the medical doctor found that both individuals were, to some degree, mentally ill and thus needed treatment; the psychologist found that both individuals were not mentally ill and did not need treatment.

¶3.     In addition to the documents submitted to the chancery court by the evaluating physicians, both R.M. and C.W. waived their rights to a commitment hearing, as is allowed under Mississippi Code Section 41-21-76 (Rev. 2013).  In their respective waiver documents, both R.M. and C.W. indicated they understood their need for treatment.  Once the waivers were received by the chancery court, the chancery court signed and entered orders of commitment; both orders were entered on the same day, March 14, 2017.

¶4.     Upon receipt of the orders of commitment, SMSH's Facility Director Sabrina Young denied admission to both patients.  Young sent a letter to the Lamar County Chancery Clerk detailing her reasons for denying admission to R.M. and C.W.  In both cases, Young, through consultation with SMSH's clinical physician, independently had determined that both R.M. and C.W. needed treatment for drug and alcohol issues, not treatment for mental illness.  And

---

[1] Initials have been used to protect anonymity.

[2] Initials have been used to protect anonymity.

3

because SMSH was not equipped to treat patients for drug and alcohol issues, Young determined that SMSH did not have services or facilities to treat adequately the two individuals. Young based her authority to deny R.M. and C.W. admission on Mississippi Code Section 41-21-77 (Rev. 2013), which states that "no person shall be so delivered or admitted until the director of the admitting institution determines that facilities and services are available."

¶5. After receiving Young's letter, the chancery court felt that it was left with no other option than to dismiss the case and release R.M. and C.W. from the custody of Lamar County. Next, the chancery court, with Special Master William Andrews[3] presiding, issued show-cause orders in both cases, directing Young, as director of SMSH, to show cause why she should not be held in contempt of court for her refusal to abide by the orders of commitment. The order also directed the Attorney General to show cause why the statute relied on by Young—Section 41-21-77—should not be declared unconstitutional to the extent that it allowed the facility director to refuse to provide medical treatment to R.M. and C.W. based on the unavailability of facilities or services.

¶6. On April 10, 2017, the chancery court conducted the show-cause hearing. Special Master Andrews presided over the hearing, and Chancellor Deborah Gambrell was in attendance. Young and the SMSH clinical physician testified at the hearing. The culmination of the testimony was clear: while the chancery court ordered the two individuals to be committed based on their mental illness, SMSH, upon reviewing the same documents

---

[3] Special Master Andrews presided over both the commitment proceedings as well as the contempt proceedings.

4

presented to the chancery court, disagreed and found that the two individuals instead needed treatment for alcohol and drug issues.

¶7. At the end of the hearing, the special master dictated his findings of fact and conclusions of law into the record, determining that Young was in civil contempt and sanctioning her the sum of $1,400, to be paid to the court within thirty days. Yet the special master did not stop there. The special master went on to find that if the finding of contempt was not upheld on review, and if Section 41-21-77 indeed allowed the director of a state hospital to overrule an order of commitment, the statute would be unconstitutional pursuant to Section 86 of the Mississippi Constitution (requiring the Legislature to provide care and treatment for the mentally ill). The special master also found Section 41-21-77 to be an encroachment of executive action on the judicial powers of the court, thus violating Section 144 of the Mississippi Constitution.

¶8. The findings of fact and conclusions of law were submitted to Chancellor Gambrell for review and signature. Chancellor Gambrell adopted these findings of fact and conclusions of law. The State of Mississippi and the Department of Mental Health appeal both cases, which this Court consolidated.

**STANDARD OF REVIEW**

¶9. Statutory interpretation is a question of law and is reviewed de novo. *Arceo v. Tolliver*, 19 So. 3d 67, 70 (Miss. 2009). As for contempt, the standard of review depends on the classification of the contempt citation. On one hand, "[i]f the contempt is civil, the proper standard utilized for review is the manifest error rule." *In re McDonald*, 98 So. 3d

5

1040, 1043 (Miss. 2012). On the other hand, when reviewing a citation for criminal contempt, this Court "will proceed ab initio and will determine on the record whether the person is guilty of contempt beyond a reasonable doubt." *Id.* But if a case necessitates reversal on other procedural grounds, it is not necessary to review the record to determine if a defendant is guilty beyond a reasonable doubt. *Id.*

## DISCUSSION

### I. Mississippi Code Section 41-21-77

¶10. The basis for the chancery court's contempt finding was that the facility director was without authority to deny admission to R.M. and C.W. for mental-illness treatment at SMSH. And so, as an initial matter, to review properly the contempt finding, this Court first must determine what authority, if any, Section 41-21-77 grants to a facility director as it relates to admissions.

¶11. When engaging in statutory interpretation, we begin with the text of the statutory provision in question. Broadly speaking, Section 41-21-77 sets forth the procedures to be followed when an individual has been committed to a treatment facility. Among numerous other directives, Section 41-21-77 provides that "no person shall be so delivered or admitted until the director of the admitting institution determines that facilities and services are available." This clause, this Court has said, is a qualification that merely protects the hospital against overcrowding. *Attorney Gen. v. In Interest of B.C.M.*, 744 So. 2d 299, 302 (Miss. 1999). But "[i]t does not equip the director of such an institution to exercise discretion regarding the necessity of an individual's placement in a state facility." *Id.* Indeed, "[t]here

6

is nothing in this statement by the Legislature suggesting that the director has any authority to override a court's decision to commit an individual." *Id.*

¶12. In its appeal, the linchpin of the State's argument is that, within Section 41-21-77, a definitional distinction exists between the terms "facilities" and "services." "Facilities," the State argues, denotes an actual, physical place, while "services" means clinically specialized treatments. "Treatment facility" is defined under the statute as:

> [A] hospital, community mental health center, or other institution qualified to provide care and treatment for persons with mental illness, persons with an intellectual disability or chemically dependent persons.

Miss. Code Ann. § 41-21-61(i) (Rev. 2013). The term "services," however, is left undefined under the statute.

¶13. The State contends that the issue here is with the word "services," not "facilities." And, as the State correctly notes in its brief, in *B.C.M.*, this Court was confronted with a denial of admission based on a facility's lack of actual physical capacity (beds) to admit the individual, unlike here, where denial was based on the availability of clinical services. *See B.C.M*, 744 So. 2d at 302. Thus, the State concludes, this Court's holding in *B.C.M.* is inapplicable here. But we fail to see how such a factual distinction would render the holding of that case inapplicable here. While *B.C.M.* may have addressed a different reason for which a facility denied admission to an individual, in the opinion, this Court interpreted the meaning of the statute nonetheless. And it did so without any qualifications or equivocations. To this extent, this Court was clear: the statute does not arm a facility director with the independent discretion to override a court order of commitment. *See id.*

7

¶14.    Here, the facts are simple.  The chancery court, after reviewing documents submitted by the evaluating physicians, came to the conclusions that R.M. and C.W. needed treatment for mental illness. And it issued orders of commitment consistent with those conclusions. Then, upon receiving the orders of the chancery court, the facility director, Young, reviewed the same documentation that the chancery court reviewed and arrived at the conclusion that the chancery court was wrong; what these two individuals needed, Young found, was not treatment for mental illness, but treatment for drug and alcohol addiction.  But this was not Young's call to make.  The chancery court's determination on the necessity of treatment for mental illness, however wrong it theoretically may have been, was its ruling nonetheless. And it was entitled to the full force of law. Young and SMSH were not at liberty to second guess the chancery court and to determine for themselves whether mental-illness treatment for R.M. or C.W. was necessary.

¶15.    Again, the distinction between facility and services, a distinction into which the State puts much stock, on these facts, is irrelevant.  Perhaps, had the chancery court determined that the two individuals needed treatment for alcohol and drug addiction and erroneously ordered them to be committed at SMSH (erroneous in that SMSH is without capability to treat alcohol and drug issues), then an argument may exist that SMSH was without facilities or services for treatment, as contemplated by the statute—both in the physical and clinical sense.  But that was not the case.  And the two individuals were committed for treatment of mental illness, which SMSH undeniably was equipped to treat, both with physical facilities and clinical capabilities.

¶16. At bottom, the chancery court had found that these two individuals should be treated for mental illness, and it is undisputed that SMSH possessed both the facilities and services for such treatment, notwithstanding Young's independent conclusion overriding the chancery court's orders. And this is precisely what this Court has held as an impermissible exercise of discretion. *See B.C.M.*, 744 So. 2d at 302. So Young's reliance on Section 41-21-77 is misplaced.

¶17. We turn next to the constitutional issue raised by the chancery court. In its contempt ruling, the chancery court alternatively held that, if Section 41-21-77 allows the director of a state hospital to overrule an order of commitment, then the statute violates certain sections of the Mississippi Constitution. Namely, it would violate Section 86 (placing the duty of the treatment and care of the insane on the Legislature) and Section 144 (vesting the judicial power in the Supreme Court and other courts). *See* Miss. Const. art. 4, § 86; Miss. Const. art. 6, § 144.

¶18. As to the constitutionality of the statute, we decline to pass judgment on its constitutionality for several reasons. First is this Court's well-established presumption that a statute is constitutional unless the statute is shown to be in "palpable conflict with some plain provision of the constitution." *B.C.M.*, 744 So. 2d at 301 (quoting *State v. Mississippi Ass'n of Supervisors, Inc.*, 699 So. 2d 1221, 1223 (Miss. 1997)). We find that there is no "palpable conflict" between the statute, as interpreted above, and any provisions of our Constitution. The State argued that Section 41-21-77 cloaked the facility director with the discretion to override a court order and deny admission to the two individuals; it does not.

And so, despite Lamar County's arguments, the statute is not in palpable conflict with the Section 86, nor is it an encroachment of the executive into a judicial function thus in violation of Section 144. Accordingly, we refrain from ruling on the constitutionality of Section 41-21-77, as it is not in "palpable conflict" with any plain provisions of the Constitution.

¶19. But that is not the only reason we should refrain from engaging in a constitutional examination of Section 41-21-77. The genesis of the constitutional issue here derives from the chancery court's "alternative" holding. It is axiomatic that statements which are unnecessary to a court's ruling are *dicta*. **McKibben v. City of Jackson**, 193 So. 2d 741, 744 (Miss. 1967). That said, alternative holdings are not automatically *dicta*. **Woods v. Interstate Realty Co.**, 337 U.S. 535, 537, 69 S. Ct. 1235, 93 L. Ed. 1524 (1949) (holding that "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.").

¶20. Here, the record is clear; the statute did not do what Young thought it did, and thus she had no legal grounds to overrule the orders of commitment. The finding of contempt had absolutely nothing to do with the possibility of the statute's unconstitutionality. In fact, had the statute been declared unconstitutional, likely, no grounds would exist to find Young in contempt, as she would have been cloaked with legal authority to deny admission, regardless of however unconstitutional that authority might have been.

¶21. Simply put, the chancery court could have found Young in contempt only if Section 41-21-77 did not grant her the authority to refuse admission to the individuals; it could not

10

have found Young in contempt if Section 41-21-77 did grant her the authority to refuse admission but was unconstitutional. And the special master admitted as much when he stated:

> In the event that the finding of contempt is not upheld upon review, it is the opinion of this [c]ourt that Section 41-21-77[,] that allows the director of a hospital . . . to overrule an order of commitment[,] is unconstitutional[.]

And so, by his own words, the special master acknowledged that the only reason the constitutional issue would arise was if, and only if, the contempt finding was not upheld. What is more, the record reveals that the special master had some hesitation regarding the propriety of a constitutionally based alternative finding. From the bench, he stated: "Now, on the constitutionality issue I recognize . . . that the [c]ourt may be off-base in rendering a decision in that regard." This is further evidence of the unnecessary nature of the alternative holding. Simply put, by making the alternative holding, the chancery court was hedging its bets in the event that this Court decided to reverse the finding of contempt (presumably based on Section 41-21-77).

¶22.    The chancery court's alternative holding addressing the constitutionality of the statute was a statement unnecessary to the chancery court's finding of contempt. The decision holding Young in contempt did not "[rest] on two or more grounds;" it rested on only one Young's failure to comply with a court order. It is *dicta*, and, as such, we decline to address the alternative holding here.

¶23.    We find that the chancery court did not err in finding that Section 41-21-77 did not authorize Facility Director Young to override the court's orders of commitment and to deny

11

admission to R.M. and C.W. for treatment of mental illness.

## II.    Contempt

¶24.    Having determined that Section 41-21-77 did not authorize Young to override the orders of commitment, we now turn to the issue underlying this appeal the chancery court's citation of civil contempt. In its findings of fact and conclusions of law, the chancery court found Young to be in civil contempt for her failure to comply with Section 41-21-77. As to the specifics of the contempt sanction, the chancery court found:

> The director is in civil contempt of this [c]ourt and should be sanctioned. It is the opinion of the [c]ourt that the director should be sanctioned at the rate of $100 per day for seven days in each of these cases for a total of [fourteen] days and should be sanctioned the sum of $1,400, which she should pay into this [c]ourt within the next [thirty] days.

¶25.    To review a citation for contempt, we must first classify the nature and purpose of the citation of contempt, as contempt citations come in two varieties: criminal and civil.

### A.    Classification of the Contempt

¶26.    When determining the type of contempt, the initial inquiry is whether the contempt is civil or criminal in nature. *In re Smith*, 926 So. 2d 878, 887 (Miss. 2006). And though the chancery court found that the contempt here was civil, its classification is not conclusive. *In re McDonald*, 98 So. 3d at 1043. Thus, in undertaking this task, "this Court focuses on the purpose for which the [contempt] power was exercised." *Id.* In other words, "the determination should focus on the character of the sanction itself and not the intent of the court imposing the sanction." *Id.*

¶27.    This Court previously has distinguished between civil and criminal contempt as

12

follows:

> If the primary purpose of the contempt order is to enforce the rights of private[-]party litigants or enforce compliance with a court order, then the contempt is civil. ***Purvis v. Purvis***, 657 So. 2d 794, 796 (Miss. 1994). The contemnor may be jailed or fined for civil contempt; however, the contemnor must be relieved of the penalty when he performs the required act. ***Id.*** at 796–97. Criminal contempt penalties, on the other hand, are designed to punish the contemnor for disobedience of a court order; punishment is for past offenses and does not terminate upon compliance with the court order. ***Common Cause of Miss. v. Smith***, 548 So. 2d 412, 415–16 (Miss. 1989).

*In re Williamson*, 838 So. 2d 226, 237 (Miss. 2002). What is more, "in criminal contempt, the court is the aggrieved party, so the fine is paid to the court." *Illinois Cent. R. Co. v. Winters*, 815 So. 2d 1168, 1180 (Miss. 2002), *overruled on other grounds by Cooper Tire & Rubber Co. v. McGill*, 890 So. 2d 859 (Miss. 2004).

¶28.    Lamar County argues that since enforcement of the chancery court's orders was not available (because R.M. and C.W. had been released and their cases dismissed), the chancery court was using the power of contempt to ensure future compliance with its orders, thus making this a citation for civil contempt. We disagree.

¶29.    Despite Lamar County's contention, everything in the record, and indeed even Lamar County's own framing of the issue, reveals that while the contempt was titled as civil, it was, in fact, criminal in nature. For one, the finding of contempt was to punish the facility director for the *past actions* of refusing admission to R.M. and C.W. and sending letters to the chancery court advising that the facility did not have services adequately to address the patients' alcohol and substance-abuse treatment. The finding of contempt was not intended "to compel compliance with an order, admonition, or instruction, but rather as punishment

13

for past offenses." ***In re McDonald***, 98 So. 3d at 1043.

¶30. Further, even Lamar County agrees that there is no way the facility director could purge (relieve) herself of the contempt, since the cases were dismissed. Such provides even further evidence that the citation was for criminal contempt. *See **In re Williamson***, 838 So. 2d at 237. And, while Lamar County argues that the contempt was civil because it was to ensure future compliance with court orders, those orders are nonexistent. Should they be discovered at some point in the future, they will be wholly separate from the present case. This is unlike a citation of civil contempt for a father in arrears on child-support obligations who can cure contempt by complying with the court order and paying. Here, there is no such order for which the chancery court could use the power of civil contempt to enforce compliance. The two individuals were released by the chancery court, the case was dismissed, and the individuals are not in the custody of the Mississippi Department of Mental Health. So it is clear that, in this case, the contempt—while perhaps serving the collateral benefit of compelling compliance with hypothetical, future, court orders—primarily was to punish the facility director for her past act of failing to comply with the commitment orders.

¶31. Lastly, the record shows that, pursuant to the citation of contempt, Young was to pay a defined amount of money as a fine directly to the chancery court itself, not to a private litigant. *See **Winters***, 815 So. 2d at 867. Taken altogether, the evidence in the record reveals that the chancery court's citation of civil contempt actually was a citation of criminal contempt.

¶32. But the analysis does not end there. The next determination to be made is whether the

14

criminal contempt was constructive or direct. "Where the act constituting the contempt is committed in the immediate presence of the court, the contempt is defined as direct. Where an act is committed out of the presence of the court, the proceeding to punish is for indirect (sometimes called constructive) contempt." *Varvaris v. State*, 512 So. 2d 886, 887 (Miss. 1987). Here, it is clear that the alleged contemptuous act, refusing to comply with orders of commitment, occurred outside the presence of the chancery court. So this is a case of constructive-criminal contempt, which requires additional procedural safeguards.

### B.     Constructive-Criminal-Contempt Procedure

¶33.    Because the contempt citation was a constructive-criminal-contempt citation, our next task is determine if the chancery court adhered to the procedural safeguards that such a citation demands. This Court has held that, in a case of constructive-criminal contempt, "defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing." *In re Williamson*, 838 So. 2d at 237. Here, as a general matter, the special master did provide some notice to Young of the nature of the alleged contumacious conduct and charges through the orders to show cause. And the special master held a hearing.

¶34.    Yet, when reviewing the record, other procedural defects (specific to constructive-criminal contempt) emerge. For one, since Special Master Andrews initiated the constructive-criminal-contempt proceedings, he was required to recuse himself and to have the hearings conducted by another judge. *See In re McDonald*, 98 So. 3d at 1044. This Court has held:

15

[I]n cases of indirect or constructive criminal contempt, "where the trial judge has substantial personal involvement in the prosecution, the accused contemnor must be tried by another judge." . . . [E]xamples of "substantial personal involvement in the prosecution" warranting recusal include cases where the trial judge acts as a "one-man grand jury;" where the trial judge is "instrumental in the initiation of the constructive-contempt proceedings;" and where the trial judge "acts as prosecutor and judge."

*Graves v. State*, 66 So. 3d 148, 154 (Miss. 2011) (internal quotations and citations omitted).

What is more, this Court long has held "that a judge *who initiates constructive contempt proceedings* has substantial personal involvement and must recuse himself." ***In re McDonald***, 98 So. 3d at 1044 (emphasis added). Here, Special Master Andrews initiated the contempt proceedings when he issued the show-cause order. And because the proceedings were for constructive-criminal contempt, Special Master Andrews was required to recuse himself. He did not. We find that his failure to do so requires reversal of the contempt judgment.

¶35. But that is not all. As mentioned above, the order to show cause provided some notice to Young of the nature of the alleged contumacious conduct and charges, but it is undisputed that the special master did not issue a summons notifying Young of the criminal nature of the proceedings. The special master believed he was initiating not criminal-contempt proceedings but civil-contempt proceedings. Nonetheless, "[c]riminal-contempt defendants are entitled to notice under Mississippi Rule of Civil Procedure 81(d), which requires service of process." *Id.* at 1045; M.R.C.P 81(d)(2).

¶36. Here, the record shows that Young was not provided notice through Rule 81. As discussed above, Young's citation was a citation of criminal contempt, and so she was

16

entitled to notice via a Rule 81 summons. The chancery court failed to provide such notice, and, therefore, we find that the chancery court erred, creating an additional ground for reversal.

¶37. We find that the chancery court's classification of the contempt citation was in error, and this erroneous classification led the chancery court to conduct the contempt proceedings in a procedurally defective manner. As for the substance of the contempt finding, due to the procedural defects of the criminal-contempt proceedings, we need not consider whether the citation was correct substantively. *See In re McDonald*, 98 So. 3d at 1043. Based on the chancery court's procedural error, we reverse the chancery court's contempt finding and remand the case for an entry of an order of recusal; we otherwise order proceedings consistent with this opinion.

## CONCLUSION

¶38. Young's reliance on Section 41-21-77 is misplaced, as it does not provided facility directors with the authority to second-guess the court and to refuse to comply with a lawful order of commitment. For this erroneous reliance on Section 41-21-77, Young was found to have been in civil contempt. But, upon reviewing the record, we find that, while the chancery court labeled Young's contemptuous conduct as civil, it was in fact criminal. This is not merely a superficial issue of semantics and labels, for along with criminal contempt flows various important procedural safeguards, safeguards that were not followed in this case. As a result, we reverse the chancery court's contempt finding, and we remand the case for entry of an order of recusal; we otherwise order proceedings consistent with this opinion.

17

¶39.    **REVERSED AND REMANDED.**

   **WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**